**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                                )
GREGORY JACKSON,                )
                                )
            Plaintiff,          )
                                ) Civil Action No. 04-929 (EGS)
        v.                      )
                                )
DISTRICT OF COLUMBIA, et al.,   )
                                )
            Defendants.         )
_____)
```

<u>**MEMORANDUM OPINION**</u>

Plaintiff Gregory Jackson, ("Officer Jackson"), an officer with the Metropolitan Police Department for the District of Columbia ("MPD") filed a complaint against defendants District of Columbia and MPD Captain Michael Eldridge ("Captain Eldridge") alleging false arrest, false imprisonment, malicious prosecution, intentional infliction of emotional distress, defamation, negligence and violations of 42 U.S.C. § 1983.  Pending before this Court is defendants' Motion for Summary Judgment.  Upon consideration of the motion, the response and reply thereto, the applicable law, and the entire record, the Court **grants** defendants' motion.

I.   **BACKGROUND**

Although the parties may disagree on the significance of
certain facts, the facts themselves are essentially undisputed.
Plaintiff Gregory Jackson was an officer assigned to the MPD's
Fifth District.  Defendants' Statement of Material Facts to Which
There is No Genuine Dispute ("Def.s' Facts") ¶ 3; Plaintiff's
Statement of Material Facts in Dispute ("Pl.'s Facts") ¶ 1.  On
December 23, 2004, plaintiff reported to work wearing an earring,
in violation of MPD regulations.  Def.s' Facts ¶ 5; Pl.'s Facts
¶¶ 1, 2.  After roll call, plaintiff's supervisor, Lieutenant
Netter ("Lt. Netter"), asked plaintiff to remove his earring, but
plaintiff refused.  Def.s' Facts ¶ 8; Pl.'s Facts ¶ 2.[1]  Lt.

---

[1]Although the question of whether Officer Jackson agreed to
remove the earring is irrelevant to the resolution of the motion
for summary judgment, the Court notes that while Plaintiff's
Statement of Facts contends that plaintiff said he would place
the earring in his locker, plaintiff's testimony at the Trial
Review Board contradicts that statement.  Officer Jackson stated,
"I'm currently a student in divinity ... and I made a covenant
with God when I became ordained as a deacon that I would take
something as a sign that showed the light of him in my life.  I
was written up for this – that very same thing back in February
2003, which I served 10 days with no problem because if I'm
wrong, if I'm guilty, I'll take my hit.  I don't run from
trouble.  But if I want to stand for something, I've got to
clearly stand for it.  And since I stood for my earring and let
God know that I was being true and faithful to him, at that
point, I said, I can make conveniences or I can make arrangements
to see to it that when I'm working on duty that I cover it up,
which I did.  And that's the reason I wear the earring."
Defendants' Motion for Summary Judgment ("Def.s' Mot."), Ex. 2
(Excerpts from the Trial Review Board) at 173.  And when asked
"But you entered a plea of guilty to the charge of wearing of the
earring was [sic] in violation of Department orders?," Officer
Jackson answered "Yes, it was."  *Id.*

Netter then revoked plaintiff's police powers and ordered him to
turn in his police-issued uniform and equipment.  Def.s' Facts ¶
9, 13; Pl.'s Facts ¶ 1.  Plaintiff went to the locker room and
Lt. Netter followed.  Def.s' Facts ¶ 11; Pl.'s Facts ¶ 4.
Plaintiff turned in his uniform and equipment.  Def.s' Facts ¶
14; Pl.'s Facts ¶ 4.

According to plaintiff, Lt. Netter repeatedly blocked
plaintiff from leaving the locker room and "placed his hand on
his weapon in an aggressive posture and told the other officer
that Plaintiff could [sic] and that he was not worried about the
Plaintiff."  Pl.'s Facts ¶ 6-7.  Other officers were present in
the locker room, and at some point plaintiff was instructed to go
upstairs to see Captain Owens ("Cpt. Owens").  Def.s' Facts ¶ 15;
Pl.'s Facts ¶ 5.  Plaintiff testified that while he was waiting
upstairs to see the Captain, Lt. Netter "continued to act in a
threatening manner toward Plaintiff, by walking by, adjusting his
weapon and grunting at Plaintiff."  Pl.'s Facts ¶ 9.

Plaintiff spoke with Cpt. Owens, who asked plaintiff a
series of questions about the incident.  Pl.'s Facts ¶ 10.
Plaintiff told Captain Owens that he felt threatened by Lt.
Netter because Lt. Netter was standing in plaintiff's personal
space.  Def.s' Facts ¶ 16-17; see *also* Def.s' Mot., Ex. 2 at 15-
16 (Cpt. Owens's testimony).  After meeting with plaintiff, Cpt.
Owens determined that the matter could not be resolved without

3

revoking plaintiff's police powers.  *Id.*  Plaintiff was instructed to report to the Fifth District on December 26, 2004 to resolve the matter.  Pl.'s Facts ¶ 13.

On the following day, December 24, 2004, however, plaintiff voluntarily reported to MPD's Police and Fire Clinic ("Clinic") to discuss the previous evening's incident.  Def.s' Facts ¶ 18; Pl.'s Facts ¶ 14.  At the Clinic, plaintiff completed an "Injury or Illness Report," known as a PD-42, and was initially seen by a physician, Dr. Matera.  Def.s' Facts ¶ 18-19; Pl.'s Facts ¶ 15. On the PD-42, plaintiff wrote:

> On 12/23/03 I was attacked by Lt. R. Netter at the Fifth District.  He violated my personal space and placed his hand on his gun.  He then gave me personal orders and I refused. This work related incident has caused severe mental stress and places me in a hostile working environment, that if left alone/unreported will become deadly.  I feel threaten and harrassed by this along with past incident involving Lt. Netter.  Lt. Netter is gay and I do not and will not share his lifestyle.

Def.s' Facts ¶ 20; Def.s' Mot., Ex. 1 (attachment).  *See also*, Def.s' Reply, Ex. 5 (Dr. Matera's testimony).

Dr. Matera examined plaintiff and placed him on sick leave pending an evaluation by Behavioral Health Sciences.  Def.s' Reply, Ex. 5 at 10-11.  After seeing Dr. Matera, plaintiff was seen by a doctor in the Behavioral Health Sciences Division, Dr. Filson.  Def.s' Facts ¶ 21; Pl.'s Facts ¶ 15, 17.

Meanwhile, Captain Michael Eldridge, the Deputy Director at the Police and Fire Clinic, was on duty at the Clinic.  Def.s'

Mot. Ex. (Michael Eldridge's Affidavit) ¶ 5.  Cpt. Eldridge's
responsibility as the Deputy Director was to serve as a liaison
between the doctors and the officers at the Clinic.  *Id.* ¶ 2.
According to Cpt. Eldridge's affidavit, he had no first-hand
knowledge of the events that had occurred at the Fifth District
the previous day between Lt. Netter and plaintiff.  *Id.* ¶ 3.
Cpt. Eldridge reviewed plaintiff's PD-42 and plaintiff's
statement on the PD-42 that, if left alone, the situation would
become deadly.[2]  *Id.* ¶ 5.

After being seen by Dr. Filson, plaintiff proceeded to the
Clinic's checkout desk, where Cpt. Eldridge reviewed plaintiff's
paperwork and told plaintiff that he was to return to the Fifth
District and report to Commander Jennifer Greene to receive his
duty assignment.  Def.s' Facts ¶ 22; Pl.'s Facts ¶¶ 18-19.
Plaintiff responded that he could not return to the Fifth
District because of Lt. Netter and that neither Cpt. Eldridge nor

---

[2] Plaintiff suggests an actual dispute regarding whether Dr.
Matera first showed Cpt. Eldridge the PD-42, as Cpt. Eldridge
states in his affidavit, or whether Cpt. Eldridge reviewed the
PD-42 and then consulted the doctor.  Pl.'s Opp. 16; Def.s'
Mot. Ex. A ¶ 5.  While any discrepancy on this point would not
rise to the level of a material factual dispute and is not
critical to the Court's analysis, the Court notes that Dr.
Matera's testimony is not inconsistent with Cpt. Eldridge's.
Def.s' Reply Ex. 5 (Dr. Matera's Testimony) pp. 13-14 ("I would
have to read it again.  It was, obviously, a concern in a line
or two that he had written down that he did not express what he
wrote in his 42 to me.  That's why I wrote notes no suicidal,
homicidal ideation, but there was a line in the 42, if I
remember correctly, that (indiscernable) I made sure that
Captain Eldridge was aware of it.")

Commander Greene had the right to change his duty status.  Pl.'s
Facts ¶ 21.  According to plaintiff, he also told Cpt. Eldridge
that if Lt. Netter attacked plaintiff, plaintiff would defend
himself.  Pl.'s Facts ¶ 22.  Cpt. Eldridge reports that during
this conversation, plaintiff said words to the effect of "If
[Lieutenant Netter] comes at me again, I'll kill him."  Def.s'
Facts ¶ 23.  While plaintiff does not admit using those words and
simply says that he told Cpt. Eldridge he would defend himself,
plaintiff does not deny making the statement Cpt. Eldridge
reports.

Cpt. Eldridge then instructed plaintiff to return upstairs
so that Dr. Filson could re-evaluate plaintiff.  Def.s' Facts ¶
24; Pl.'s Facts ¶ 23.  Cpt. Eldridge met with Dr. Filson and
related plaintiff's statements regarding Lt. Netter, and then Dr.
Filson spoke with plaintiff.  Def.s' Facts ¶ 24; Pl.'s Facts ¶
23.  Dr. Filson told plaintiff that plaintiff's duty status was
being changed and that plaintiff could not make threats, and that
because plaintiff had made threats it would have to be reported
and Lt. Netter would need to be informed.  Def.s' Facts ¶ 25;
Pl.'s Facts ¶¶ 24-25.

According to plaintiff, after he and Cpt. Eldridge left Dr.
Filson, Cpt. Eldridge said in front of other employees, "so you
are going to the Fifth District and kill Lieutenant Netter."
Pl.'s Facts ¶ 26.  Plaintiff responded that he had not said that,

but that he would simply defend himself if attacked again by Lt. Netter. *Id.* ¶ 27. Again, according to plaintiff, Cpt. Eldridge then stated that plaintiff was making another threat and plaintiff responded that he would not allow Lt. Netter "to attack him, beat him and draw his gun on him and do nothing about it." Pl.'s Facts ¶ 28. Plaintiff was released from the Clinic.

Cpt. Eldridge states that immediately following plaintiff's departure from the Clinic, he began the process of applying for a warrant for plaintiff's arrest. Def.s' Facts ¶ 27. Cpt. Eldridge prepared an affidavit regarding the alleged threats plaintiff made at the Clinic and brought the application to the United States Attorney's Office for review. Def.s' Facts ¶¶ 27-28. Assistant United States Attorney ("AUSA") John Tishner, Chief of the Grand Jury Section, reviewed the warrant. Cpt. Eldridge and AUSA Tishner then called AUSA Clifford Keenan, and both attorneys determined that the U.S. Attorney's Office should approve the warrant. Def.s' Facts ¶¶ 29-30. Cpt. Eldridge then presented the warrant to the Honorable Ronna L. Beck, and Judge Beck signed the warrant for plaintiff's arrest. Def.s' Facts ¶ 31.

According to Cpt. Eldridge, he notified Commander Greene that he had a warrant for plaintiff's arrest, and asked her to provide an official from her division to pick up the warrant and bring it to the Office of Professional Responsibility. Def.s'

Facts ¶ 32.

The following day, which was Christmas Day, December 25, 2004, plaintiff received a phone call from a Lieutenant Sanders and was told to report to the Fifth District to see Commander Greene.  Pl.'s Facts ¶ 31.  Plaintiff left his child and the child's mother and reported to the Fifth District, where he was informed that there was a warrant for his arrest.  *Id.* ¶¶ 31-33. Agent Murphy from the Internal Affairs Division explained that they had called plaintiff to the Fifth District because they did not want to arrest him at his home on Christmas and "drag him out of his house."  *Id.* ¶ 34.  Plaintiff was then placed under arrest for making felony threats and transported by Agent Murphy and Lieutenant McKeon to the Internal Affairs Division and then to the Central Cell Block for processing.  *Id.* ¶¶ 35-40.  Plaintiff was detained overnight and arraigned the following day, after which he was released on his own recognizance under order to stay away from Lt. Netter and the Fifth District.  *Id.* ¶ 42.

On December 26, 2005, Cpt. Eldridge attempted to collect witness information for his investigation into the events at the Clinic, but the three witnesses could not confirm hearing plaintiff's statements.  Def.s' Facts ¶ 35.  According to the defendants, Cpt. Eldridge had no further involvement in the investigation of plaintiff.  *Id.* ¶ 36.

The felony threat charge against plaintiff was ultimately

reduced to a misdemeanor charge of attempting to make a threat, and on May 21, 2004, a trial commenced before the Honorable Stephen G. Milliken.  Pl.'s Facts ¶¶ 43, 45.  At the conclusion of the trial, Judge Milliken ruled that a reasonable fact finder would have to harbor a reasonable doubt as to intent and therefore he found Officer Jackson not guilty.  Def.s' Facts ¶ 37; Def.s' Mot. Ex. 3 (Criminal Hearing Transcript) ("And whether he said exactly the words that Captain Eldridge testified to, I'm satisfied that the Government establishes the threat on a life. In [sic] the phrase kill him was uttered even though in the context I find that any reasonable fact finder would have to harbor a reasonable doubt as to the intent.")

## II.  DISCUSSION

### A.   Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  *See Celotex*, 477 U.S. at 323.

In determining whether a genuine issue of material fact

exists, the court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  Moreover, if the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted).

**B.   Analysis**

Based on the events surrounding his arrest and prosecution, plaintiff filed an eight-count complaint against the District of Columbia and Captain Eldridge seeking compensatory and punitive damages.  Plaintiff asserts claims of false arrest, false imprisonment, malicious prosecution, intentional infliction of emotional distress, defamation, negligence, and denial of civil rights under 42 U.S.C. § 1983.  Second Amended Complaint, docket no. 18, dated October 11, 2005.

As discussed below, defendants argue that they are entitled to summary judgment on all of plaintiff's claims on the grounds that (1) Cpt. Eldridge is entitled to qualified immunity; (2)

Cpt. Eldridge had probable cause to arrest plaintiff; (3)
plaintiff cannot establish the elements of his malicious
prosecution and intentional infliction of emotional distress
claims; (4) plaintiff failed to provide an expert witness to
testify to the national standard of care for procedures regarding
obtaining an arrest warrant; (5) the District of Columbia cannot
be held liable for constitutional violations committed by its
employees under a theory of *respondeat superior*; and (6)
plaintiff's defamation claim must fail because Cpt. Eldridge's
statements are subject to qualified immunity.

## 1. Whether Captain Eldridge is Entitled to Qualified Immunity from Suit on Plaintiff's Constitutional Claims

Defendants argue that under certain circumstances,
government officials are entitled to qualified immunity from
constitutional and statutory claims. Def.s' Mot. 8-12; *see*,
*e.g., Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Lederman v.
United States*, 291 F.3d 36 (D.C. Cir. 2002). In order to
determine whether an officer is entitled to qualified immunity,
the Court must determine (1) whether plaintiff's allegations, if
true, demonstrate that the officer's conduct violated a
constitutional or statutory right; and (2) if the conduct did
violate such a right, was the right clearly established at the
time of the alleged violation. *See Brosseau v. Haugen*, 125 S.
Ct. 596, 598-99 (2004). According to defendants, Captain
Eldridge enjoys qualified immunity for plaintiff's claims brought

11

pursuant to 42 U.S.C. § 1982 because Cpt. Eldridge did not violate a clearly established right.  The Court agrees.

Plaintiff does not disagree with defendant's statement of the relevant law governing qualified immunity, but argues that Captain Eldridge violated plaintiff's right to be free from unreasonable seizures when he applied for an arrest warrant and had plaintiff arrested without probable cause.  Pl.'s Opp. 14-18. According to plaintiff, the "appropriate question to determine whether qualified immunity exists is whether a reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for a warrant."  *Id.* at 14.

It is important to note, again, that plaintiff does not dispute the relevant facts upon which Cpt. Eldridge based his decision to apply for a warrant, but instead plaintiff argues that Cpt. Eldridge read too much into those facts or misconstrued them.  "Where the facts are not in dispute the question of probable cause is one of law to be decided by the court."  *Dent v. May Dept. Stores* Co., 459 A.2d 1042, 1044 (D.C. 1982) (quoting *Prieto v. May Dept. Stores Co.*, 216 A.2d 577, 578 (D.C. 1966) (footnote omitted)).  Plaintiff maintains that Cpt. Eldridge "chose to take plaintiff's comments [on the PD-42] out of context," that both doctors at the Clinic told Cpt. Eldridge that plaintiff was not a danger to himself or others, Cpt. Eldridge

12

did not conduct an investigation before preparing the warrant, and that no reasonable officer would have believed probable cause existed under the circumstances in this case.  Pl.'s Opp. 14 (citing *Malley v. Briggs*, 475 U.S. 335, 344 (1986)).

In *Malley v. Briggs*, a state trooper presented a judge with warrants and accompanying affidavits describing two phone calls that had been recorded pursuant to a wiretap, and the officer's interpretation of those calls.  475 U.S. at 337-38.  The judge signed the warrants and respondents were arrested and arraigned, but the charges were subsequently dropped.  *Id.* at 338.  The respondents brought a civil action pursuant to 42 U.S.C. § 1983, claiming that the officer violated their constitutional rights when he applied for the warrant.  *Id.*  Following a jury trial, the U.S. District Court for the District of Rhode Island granted a directed verdict for the police officer, on the basis that the judge's approval of the warrant "broke the causal chain" between the application for the warrant and the arrest, and held that an officer who believes the truth of the facts stated in the warrant and submits them to a "neutral magistrate" is entitled to immunity.  *Id.* at 338-39.

The U.S. Court of Appeals for the First Circuit reversed the District Court.  The appellate court held that "an officer who seeks an arrest warrant by submitting a complaint and supporting affidavit to a judge is not entitled to immunity unless the

officer has an objectively reasonable basis for believing that the facts alleged in his affidavit are sufficient to establish probable cause." *Id.* at 339.  The U.S. Supreme Court affirmed the First Circuit.

On appeal, the officer in *Malley* argued that he should be entitled to absolute immunity because the function of applying for an arrest warrant is similar to that of a complaining witness or a prosecutor asking a grand jury to indict a suspect.  *Id.* at 340-41.  The Court rejected the officer's argument, stating

> Accordingly, we hold that the same standard of objective reasonableness that we applied in the context of a suppression hearing in *[United States v.] Leon*[, 468 U.S. 897 (1984], defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest.  Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable ... will the shield of immunity be lost.

*Id.* at 344-45.

In this case, defendants respond to plaintiff's argument by noting that the Supreme Court has held that the facts must be evaluated from the perspective of a reasonable officer on the scene, without the use of hindsight.  Def.s' Mot. 3 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989) (applying the "reasonableness" test in the context of a claim of excessive force)).  Defendants note that Cpt. Eldridge was not present at the confrontation between Lt. Netter and plaintiff, and argue that Cpt. Eldridge acted reasonably in applying for the warrant,

14

based on what he observed at the Clinic, where he was consulted by Dr. Matera regarding plaintiff's statement in the PD-42 that if left alone and unreported the situation between Lt. Netter and plaintiff "[would] become deadly," and based on plaintiff's statements to Cpt. Eldridge that if Lt. Netter came at him again plaintiff would kill him.  Def.s' Mot. 3.  The question before the Court is not whether in hindsight these facts establish probable cause.  *See Graham*, 490 U.S. at 396.  Based on the facts observed by Cpt. Eldridge at the scene, this Court cannot say that Cpt. Eldridge's "warrant application [was] so lacking in indicia of probable cause as to render official belief in its existence unreasonable" and therefore "the shield of immunity" will not be lost in this case.  *See Malley*, 475 U.S. at 344-45.  Accordingly, summary judgment for the Defendant Eldridge is granted as to Count VII of plaintiff's Second Amended Complaint.

## 2.   Plaintiff's False Arrest and False Imprisonment Claims

Defendants argue that plaintiff's false arrest and false imprisonment claims should be dismissed because Cpt. Eldridge was justified in ordering the arrest and the arrest was based on probable cause.  Def.s' Mot. 12.  As defendants point out, the principal question in false arrest and false imprisonment cases is "whether the arresting officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting officer is privileged and the action fails."  *Scott v. District*

15

*of Columbia*, 493 A.2d 319, 321 (D.C. 1985)(citation omitted); *see also District of Columbia v. Murphy*, 631 A.2d 34, 36, *reaff'd on rehearing*, 635 A.2d 929 (D.C. 1993).  Moreover, "probable cause exists if the facts and circumstances known to the arresting officer warrant a prudent man in believing that [an] offense has been committed." *Dent v. May Dept. Stores Co.*, 459 A.2d at 1044 (quoting *Shaw v. May Dept. Stores Co.*, 268 A.2d 607, 609 (D.C. 1970)).

In this case, the question is whether "the facts and circumstances" known to Cpt. Eldridge would "warrant a prudent man to believe" that plaintiff had committed the offense of making a threat to do bodily harm.  D.C. Code § 22-407, Threats to do bodily harm, provides:

> Whoever is convicted in the District of threats to do bodily harm shall be fined not more than $500 or imprisoned not more than 6 months, or both, and, in addition thereto, or in lieu thereof, may be required to give bond to keep the peace for a period not exceeding 1 year.

Under this statute, the threat need not be expressly conveyed to the intended victim.  *See Gurley v. United States*, 308 A.2d 785, 787 (D.C. 1973); *see also Joiner v. U.S.*, 585 A.2d 176, 179 (D.C. 1991) ("The government has the burden of proving the utterance of a threat and that it was communicated.  The intended victim, however, need not be aware of the threat, for the crime is completed when the threat is communicated to a third party.") (citing *Beard v. United States,* 535 A.2d 1373, 1378 (D.C. 1988)

16

and *United States v. Baish*, 460 A.2d 38, 42 (D.C. 1983) (threat must be communicated to someone, either the object of the threat or a third party)).

In this case, Cpt. Eldridge observed plaintiff at the Clinic, where plaintiff was seen by a doctor and referred for a behavioral health evaluation.  According to the evidence presented, the doctor brought the PD-42 to Cpt. Eldridge's attention because it contained a statement by plaintiff that if left alone, the situation with Lt. Netter "will become deadly." Cpt. Eldridge learned that there had been an altercation between plaintiff and Lt. Netter, and when Cpt. Eldridge spoke to plaintiff about being placed on limited duty and returning to the Fifth District, plaintiff told Cpt. Eldridge that if Lt. Netter came "at [him]" again, plaintiff would "kill him."  Under these circumstances, the Court finds that Cpt. Eldridge could have reasonably believed that plaintiff had committed an offense and therefore probable cause existed for the arrest.  *See Dent*, 459 A.2d at 1044.  Accordingly, defendants are entitled to summary judgment on plaintiff's false arrest and false imprisonment claims.

### 3.    **Plaintiff's Malicious Prosecution Claim**

To succeed on a claim for malicious prosecution, a plaintiff must establish: (1) that the underlying suit terminated in the plaintiff's favor; (2) malice on the part of the defendant; (3)

17

lack of probable cause for the underlying suit; and (4) special injury occasioned by the plaintiff as a result of the original suit.  *See Tyler v. Central Charge Serv., Inc.*, 444 A.2d 965, 968 (D.C. 1982) (citing *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980)).  Defendants argue they are entitled to summary judgment on Count III of plaintiff's complaint because plaintiff cannot establish the second or third elements of a malicious prosecution claim.  The Court agrees.

As has already been discussed, probable cause existed to arrest plaintiff based on the events that took place at the Clinic.  Moreover, plaintiff cannot establish malice on the part of Cpt. Eldridge.  Malice is established by demonstrating "the existence of a willful, wanton, reckless, or oppressive disregard for the rights of the plaintiff." *Tyler*, 444 A.2d at 969 (citing *Ammerman v. Newman*, 384 A.2d 637 (D.C. 1958)).

Plaintiff argues that defendant acted with malice in seeking the arrest warrant without an investigation, demonstrating a reckless disregard for plaintiff's right to be free from unreasonable seizures.  Pl.'s Opp. 23.  The Court is unpersuaded by this argument.  As defendant correctly points out, Cpt. Eldridge did not arrest plaintiff on the spot, but instead sought a warrant for his arrest.  Def.s' Mot. 15.  Cpt. Eldridge contacted the U.S. Attorney's Office and discussed the warrant application with an AUSA and the Section Chief.  Thereafter, he

18

brought the application to a judge, who signed the warrant.  On these undisputed facts, the Court finds that Cpt. Eldridge did not act with malice.  The Court grants summary judgment for the defendants on plaintiff's malicious prosecution claim.

### 4.   Intentional Infliction of Emotional Distress

To prevail on a claim for intentional infliction of emotional distress, plaintiff must show that the defendant (1) engaged in extreme and outrageous conduct that (2) intentionally or recklessly (3) caused him severe emotional distress.  *See Gregg v. Hay-Adams Hotel*, 942 F. Supp. 1, 10 (D.D.C. 1996) (citations omitted).  The requisite degree of "outrageousness," requires a showing that the alleged conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991) (citing Restatement (Second) of Torts § 46 cmt. d (1965)).

Plaintiff again argues that Cpt. Eldridge's decision to seek a warrant based on the events at the Clinic was unreasonable - particularly where Cpt. Eldridge knew that plaintiff was at the Clinic to seek medical attention due to stress caused by his interactions with Lt. Netter - and that probable cause was lacking.  Pl.'s Opp. 23-25.  The Court has already found otherwise.  Plaintiff also maintains that arresting him on

19

Christmas Day, detaining him overnight and subjecting him to a criminal trial caused him severe mental anguish and constituted intentional infliction of emotional distress.  Pl.'s Opp. 23-25; Second Amended Complaint Count IV.

Nothing in these facts even approaches the requisite standard of "outrageousness."  It cannot be said that the arrest and prosecution of plaintiff was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bernstein*, 649 A.2d at 1075.  Defendants are entitled to summary judgment on Count IV of plaintiff's Second Amended Complaint.

### 5.   Defamation

In Count V of his Second Amended Complaint, plaintiff claims that defendants are liable for defamation based on Cpt. Eldridge's false and slanderous statements made in connection with seeking the arrest warrant and having plaintiff prosecuted for making threats.  Plaintiff argues that Cpt. Eldridge was at least negligent in making false statements to Dr. Filson, Commander Greene, Lt. Netter, the official to whom Cpt. Eldridge applied for a warrant, and in open court during plaintiff's trial.  Pl.'s Opp. 28-29 (citing *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001)).  Plaintiff argues that at least Dr. Filson, Lt. Netter and Commander Greene did not have a need for the information Cpt. Eldridge shared with them.  Pl.'s Opp.

29.

In response, defendant notes that while charging someone
with a crime is actionable as slander *per se*, *see Farnum v.
Colbert*, 293 A.2d 279 (D.C. 1972), statements made under
qualified privilege are not actionable as slander *per se* without
a showing of excessive publication or express malice.  *See Smith
v. District of Columbia*, 399 A.2d 213, 221 (D.C. 1979) (citing
*Thomas v. Howard,* 168 A.2d 908 (D.C. 1961)).  In order to qualify
for the privilege, the communication must be made in good faith
upon a subject matter in which the party communicating or the
party receiving the communication has a legitimate interest.  *See
Smith*, 399 A.2d at 221 (holding that a security guard's
communication to his employers or to a police officer in the
course of his duties regarding suspected criminal wrongdoing was
qualifiedly privileged; the guard had a legitimate interest in
making the statement and the police department and the employer
had a legitimate interest in receiving the communication).

In this case, plaintiff has made no showing that Cpt.
Eldridge made the statements regarding plaintiff's threats in bad
faith.  Moreover, there was no excessive publication; as in
*Smith*, Cpt. Eldridge's statements were made in the course of his
duties and were made to individuals - Dr. Filson, Lt. Netter,
Commander Greene, the AUSAs, the judge signing the warrant and
the judge presiding over the trial - with legitimate interests in

receiving the communications.  Because the statements were subject to qualified immunity, defendants are entitled to summary judgment on Count V of plaintiff's compliant.

### 6. The Remaining Counts for Negligence and Constitutional Violations

Plaintiff also brings claims for negligence and violations of his constitutional rights to due process and to be free from unlawful arrest and illegal imprisonment.  Plaintiff bases his constitutional claims on the Fifth and Fourteenth Amendments to the U.S. Constitution, pursuant to 42 U.S.C. § 1983.  However, because these claims are based on plaintiff's assertion that his arrest was without probable cause, and the Court has already determined that Cpt. Eldridge acted reasonably and had probable cause for the arrest, plaintiff cannot prevail on these claims. Moreover, Defendant District of Columbia cannot be held liable for the alleged constitutional violations because plaintiff has not established that the alleged deprivations were caused by a policy, custom or practice of the District.  *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985).  While defendants acknowledge that Cpt. Eldridge failed to comply with the requirements of Teletype Number 09-098-00, setting forth the guidelines for investigating other officers within the MPD, because that teletype is merely an internal agency procedure, not a statute or regulation, it does not embody the standard of care.

22

*See Clark v. District of Columbia*, 708 A.2d 632, 636 (D.C. 1997) ("We have noted in another context that '[a]gency protocols and procedures, like agency manuals, do not have the force or effect of a statute or an administrative regulation,' but rather 'they provide officials with guidance on how they should perform those duties which are mandated by statute or regulation.") (quoting *Wanzer v. District of Columbia*, 580 A.2d 127, 133 (D.C. 1990)). Accordingly, defendants are entitled to summary judgment on Counts VI and VII of plaintiff's Second Amended Complaint.

### 7.   **Plaintiff's Unlawful Retaliation Claim**

Finally, plaintiff alleges that he was unlawfully terminated by the District of Columbia, in violation of 42 U.S.C. § 1983, in retaliation for bringing this lawsuit.  Second Amended Complaint Count III.  However, plaintiff has not alleged a single fact in support of this contention.  Indeed, plaintiff does not even address his termination at all in his Statement of Material Facts in Dispute.  Pl.'s Opp. 6-12.  Moreover, defendant argues that a single incident of unconstitutional conduct cannot give rise to liability under § 1983 unless the incident was caused by an unconstitutional policy made by a policymaker.  *See Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985); *Ross v. Dept. of Corrections, et al.*, 2006 WL 3208670 *2 (D.D.C. Nov. 7, 2006); *Stevens v. District of Columbia, et al.*, 1994 WL 377271, n.5 (D.D.C. July 6, 1994)).  Here, plaintiff has not identified a

single policy or custom approved by a policy maker to support
such liability.  Accordingly, the Court grants summary judgment
to defendants on Count VIII of plaintiff's Second Amended
Complaint.

### III. Conclusion

For the foregoing reasons, Defendants' Motion for Summary
Judgment is **GRANTED**.  An appropriate Order accompanies this
Memorandum Opinion.


**Signed:**      **Emmet G. Sullivan**
            **United States District Judge**
            **March 31, 2008**